UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CONSERVATION NORTHWEST; GIFFORD PINCHOT TASK FORCE; ENVIRONMENTAL PROTECTION INFORMATION CENTER; KLAMATH FOREST ALLIANCE; UMPQUA WATERSHEDS, INC.; SISKIYOU REGIONAL EDUCATION PROJECT; KLAMATH-SISKIYOU WILDLANDS CENTER; OREGON WILD AMERICAN LANDS ALLIANCE; CENTER FOR BIOLOGICAL DIVERSITY; and NOTHCOAST ENVIRONMENTAL CENTER, | Case No. C08-1067-JCC<br><br>ORDER |
| Plaintiffs, | |
| v. | |
| MARK E. REY; C. STEPHEN ALLRED; SYNTHIA U. BARRY; U.S. FOREST SERVICE; U.S. BUREAU OF LAND MANAGEMENT; and U.S. FISH AND WILDLIFE SERVICE, | |
| Defendants, | |
| and | |
| D.R. JOHNSON LUMBER COMPANY, | |
| Defendant-Intervenor. | |

ORDER
PAGE - 1

This matter comes before the Court on the parties' cross-motions for summary judgment: Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 34); Federal Defendants' Cross-Motion for Summary Judgment and Memorandum in Support of Summary Judgment and In Opposition to Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 45), and embedded Motion to Strike the Declaration of Dennis Odion (*see id.* at 10); Defendant-Intervenor's Cross Motion for Summary Judgment and Memorandum in Response to Plaintiffs' Motion for Summary Judgment (Dkt. No. 46); Plaintiffs' Opposition and Reply (Dkt. No. 49); Federal Defendants' Reply (Dkt. No. 55); and Defendant-Intervenor's Reply (Dkt. No. 58).[1] Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS IN PART the cross-motions for the reasons explained herein.

## I.      BACKGROUND

This is the latest episode in a long history of litigation and political action concerning the protection of species in Washington, Oregon, and northern California forested land. This controversy has its origins in actions initiated in the early 1990s over the northern spotted owl, and at is heart is the controversy over logging in these states' rare old growth forests.

Since the early 1990s, federal courts have been involved in ensuring responsible management of these forests. The story begins with *Seattle Audubon Society v. Evans*, in which Judge Dwyer of this Court enjoined the Forest Service from selling logging rights to land until it adopted standards and guidelines to ensure the protection of the northern spotted owl. 771 F.Supp. 1081 (W.D. Wash. 1991), *aff'd* 952 F.2d 297 (9th Cir. 1991). Although the owl's legend borders on infamy, the owl has always really been a proxy for waning old growth forests: it is an indicator species whose fate is a "viability measure for other wildlife—for an

---

[1] The Court set a special briefing schedule allowing for increased page limits and for Defendants' replies. (*See* Dkt. Nos. 20, 32, 44.)

ecosystem—in the remaining old growth." *Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291, 1301 (W.D. Wash. 1994), *aff'd* 80 F.3d 1401 (9th Cir. 1996). In response to the Court's order in 1991, the Forest Service prepared an environmental impact statement ("EIS"), which listed a number of alternative standards and guidelines, and then released a Record of Decision ("ROD") adopting the Forest Service's preferred alternative.[2] But in *Seattle Audubon Society v. Moseley*, 798 F.Supp. 1473 (W.D. Wash. 1992), *aff'd sub nom. Seattle Audobon Society v. Espy*, 998 F.2d 699 (9th Cir. 1993), Judge Dwyer again rejected the Forest Service's actions, because the agency failed to comply with the National Environmental Procedure Act ("NEPA"), 42 U.S.C. §§ 4321–4370d. Specifically, the EIS failed to meaningfully address scientific uncertainties that tainted the evidence on which the Forest Service's remedial strategy rested; failed to include a full discussion of what effect, if any, a decrease in spotted owl viability would have on other old-growth dependent species; and improperly based its owl-viability assessment on the assumption that all agencies involved would follow the same strategy. *Espy*, 998 F.2d at 704.

In 1993, in reaction to ongoing litigation over the fate of the spotted owl, President Clinton created a cabinet-level, interagency panel, called the Forest Ecosystem Management Assessment Team ("FEMAT"), to address these issues and, eventually, to call a truce between conservationists and logging concerns.[3] FEMAT evaluated and identified ten alternative management options for the western states' forested land, and recommended one; after a supplemental EIS ("SEIS"), in 1994, the Secretaries of Agriculture and Interior issued an ROD

---

[2] This is the ordinary decisional process. First, the agency prepares an environmental impact statement ("EIS") that discloses the scientific bases for several alternative choices, and recommends one choice. Then, the agency acts on the recommendations in the impact statement in a Record of Decision ("ROD").

[3] *See* Felicity Barringer, *New Battle of Logging vs. Spotted Owls Looms in West*, N.Y. Times, Oct. 18. 2007, *available at* http://www.nytimes.com/2007/10/18/us/18owl.html (calling the Northwest Forest Plan a "truce").

adopting FEMAT's preferred alternative, which became known as the Northwest Forest Plan (sometimes referred to herein as "the Plan"). That same year, Judge Dwyer upheld the legality of the Northwest Forest Plan. *Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291, *aff'd sub nom. Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996).

The Northwest Forest Plan amended the planning documents of the nineteen National Forest and nine Bureau of Land Management ("BLM") lands within the range of the northwest spotted owl. (Pls.' Mot. 2 (Dkt. No. 24 at 7).) The Plan covers 24.5 million acres of federal lands in three states, ranging from San Francisco to the Canadian border. (*Id.*) The purpose of the plan was twofold: (1) to protect the long-term health of the forest ecosystem, and (2) to provide a sustainable supply of timber and other forest products. It was thus "intended to conserve late-successional forest related species and produce a sustainable level of timber harvest." 2007 FS ROD, AR 17307, at 4; 2007 BLM ROD, AR 17306, at 4.[4] This is generally consistent with the manifold uses for which federally managed western lands are designated— "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528; 16 U.S.C. § 1604(e). It is the balancing act between commercial use and conservation that sparks cases such as the one before the Court today.

The Northwest Forest Plan designates land allocations across the 24.5 million acres; approximately 19 million acres—or around 77%—of the land covered is protected in "Reserves," while 4 million comprise the "Matrix," and 1.5 million acres comprise "Adaptive Management Areas." *Northwest Ecosystem Alliance v. Rey*, 380 F. Supp. 2d 1175, 1182 (W.D.

---

[4] The administrative record is voluminous and not docketed, but is available to the Court on CD. The Court will cite to the Administrative Record as "AR,", and will refer to each document, wherever possible, by identifying what it is. Because there are no genuine disputes of material fact, for ease of future reference (because they are available online), the Court occasionally refers to more complex fact statements and concomitant record cites in the parties' briefs, or in fact statements from previous cases considering related issues.

Wash. 2005) (Pechman, J., presiding) (hereinafter *NEA*). Most commercial logging occurs in "Matrix" areas. *Id.* The Reserves are designed to protect late-successional and old-growth habitat, and manage previously disturbed forests so that they may become late-successional. *Id.* The overlap between the age of the forest and the designation is not perfect, however, and there are some mature and old-growth forests in the Matrix areas, and some younger, unforested, or previously logged forests in the Reserve areas. (*See* Pls.' Mot. 4 (Dkt. No. 34 at 9).) Logging is only allowed in Reserves under very limited circumstances. (*Id.*) The Northwest Plan contained estimations of annual probable sales of timber, which have fluctuated over the years.

One of the components of the Northwest Forest Plan is "Survey and Manage." When the Plan was enacted, it endeavored to account for approximately 400 rare or uncommon plant, animal, and fungal species, or species about which little is known, which have a "close association" with late-successional or old growth forests. *NEA*, 380 F. Supp. 2d at 1182; 2007 BLM ROD, AR 17306, at 4; 2001 ROD at 77, AR 2392. In response to the concern that the Plan would not adequately protect these species, the Plan required the agencies to engage in four primary mitigation measures: (1) manage known sites of certain species; (2) conduct surveys prior to ground-disturbing activities; (3) conduct extensive surveys to find high priority sites for hard-to-find species, and (4) conduct general regional surveys to gain information about poorly known species. *NEA*, 380 F. Supp. 2d at 1182–83 (administrative record cites omitted). Grouped together, these mandates are known as "Survey and Manage," and the standards and guidelines' purpose is manifold; in addition to helping the agencies gather information about little-known species, Survey and Manage also allows for important ecological functions to proceed, increasing the likelihood of a stable, well-distributed population of species on federally managed lands.[5]

---

[5] Survey and Manage species are generally not, shall we say, the mascot types. They mainly consist of fungi, bryophytes, lichens, mollusks, vascular plants, and four arthropod groups. Although charismatic megafauna they are not, E.O. Wilson called invertebrate species,

Survey and Manage is, however, only one part of the Plan's overall strategy to meet species stability and distribution objectives. 2000 FSEIS at 68, AR 1465. While it does prevent some logging of mature and old-growth forests in the Matrix and Adaptive Management Areas, it is not the only such barrier, nor is it a wholesale ban on such logging. 1994 ROD at 33, AR 4149. Nonetheless, Survey and Manage—along with measures implemented by the rest of the Plan—unquestionably reduces the number of "board feet" available to commercial logging every year; according to the agencies' estimation, it has reduced expected timber production from 4.5 billion to approximately 958 million board feet per year in the spotted owl habitat areas. (*See* Defs.' Mot. 5 (Dkt. No. 45 at 14); 1994 FSEIS at 43, 405–406, AR 3017, 3379–80. And, at the outset, Survey and Manage did not contain a detailed assessment of the costs of its implementation, and was expected to have a "relatively minor" effect on maintaining a functional late-successional forest ecosystem because the species protected were thought to be rare. 2007 FS ROD, AR 17307, at 4; 2007 BLM ROD, AR 17306, at 4; 2004 FSEIS at 17, AR 16299; 2000 FSEIS at 58, AR 1455.

Within a few years, the Agencies realized that "Survey and Manage was presenting unanticipated difficulties in land management" because the requirements "were not clear, efficient, or practicable." 2004 FSEIS at 18, AR 16299. The Agencies have been attempting to reduce, streamline, or eliminate Survey and Manage for nearly a decade, and have been engaged in near-constant litigation over their actions.

In 2000, the Agencies sought to evaluate the previous six years of experience in administrating Survey and Manage, and to respond to new information, which left the agencies "unable to fully meet the original purpose and need" of the Northwest Forest Plan. *NEA*, 380 F. Supp. 2d at 1183. The Agencies amended certain provisions of Survey and Manage to

which are essential for the health of forests and all ecosystems, "the little things that run the world." E.O. Wilson, *The Little Things that Run the World (The Importance and Conservation of Invertebrates)*, CONSERVATION BIOLOGY, December 1987, at 344.

1    streamline the program through a 2001 ROD, based on a 2000 SEIS. *Id.* This decision was met

2    with a challenge by both the timber industry and a coalition of environmental groups. That

3    case, *Douglas Timber Operators*, ended with a settlement agreement requiring the Agencies to

4    consider completely eliminating Survey and Manage. *See Douglas Timber Operators v. Rey*,

5    No. 01-6378-AA (D. Or. 2001); *NEA*, 380 F. Supp. 2d at 1183. The case was dismissed

6    pending a new SEIS, which was prepared in 2004.

7        The 2004 SEIS examined three alternatives to address the Survey and Manage

8    standard: (1) retaining the standard (the no-action alternative), (2) eliminating the standard, and

9    (3) retaining but modifying the standard in certain ways. *NEA*, 380 F. Supp. 2d at 1183. The

10   SEIS identified eliminating the standard as the preferred alternative, and the Agencies issued

11   an ROD adopting the preferred alternative of elimination of Survey and Manage in 2004. *Id.*

12   The decision to eliminate Survey and Manage was challenged in this Court. *Id.* Plaintiffs

13   alleged that the 2004 ROD and SEIS violated NEPA in six ways, and Judge Pechman agreed

14   as to three: (1) the SEIS improperly assumed that a number of species covered by Survey and

15   Manage would be protected by a separate program, under which regional foresters and

16   directors were to exercise discretion and exclude the species; (2) the Agencies failed to provide

17   a thorough analysis of their assumption that late-successional reserves would adequately

18   protect species protected by Survey and Manage; and (3) the SEIS violated NEPA by

19   overestimating acreage in need of hazardous fuel treatments, and failing to disclose and

20   explore the information necessary to make a reasoned decision; accordingly, the cost estimates

21   based on these acreage figures was inadequate. *Id.* at 1189–98.

22       Although the Court held at that time (August 1, 2005) that the decision to eliminate

23   Survey and Manage violated NEPA, the Court requested supplemental briefing on the

24   appropriate remedy. On January 9, 2006, the Court issued an Order on Plaintiffs' request for a

25   preliminary injunction, which (1) set aside the 2004 ROD; (2) reinstated the 2001 ROD; and

26   (3) enjoined Defendants from authorizing logging on projects to which the 2001 ROD applied,

1    unless those projects were in compliance with the 2001 ROD. *NEA v. Rey*, 2006 WL 44361, at

2    *9 (W.D. Wash. Jan. 9, 2006). The third condition was later modified to allow habitat-

3    disturbing activities in areas to which the 2004 ROD applied—so long as the logging fell into

4    one of four limited categories. *NEA v. Rey*, C04-0844-P (Dkt. No. 109), at 2–3.

5            In response to Judge Pechman's orders in *NEA v. Rey*, the Agencies began preparing a

6    supplement to the 2004 SEIS to address the NEPA deficiencies. A draft of that SEIS was

7    issued for public review in July, 2006. *See* AR 395–564.

8            Meanwhile, in November, 2006, in a separate case involving two BLM projects

9    covered by the Plan, the Ninth Circuit found that BLM decisions downgrading a designation

10   for the red tree vole (a rodent upon which the spotted owl feeds) violated both the Federal

11   Land Policy and Management Act and NEPA. *Klamath-Siskiyou Wildlands Center v. Boody*,

12   468 F.3d 549 (9th Cir. 2006).[6] The Ninth Circuit found that BLM had failed to conduct a

13   NEPA analysis—requiring the agency to comply with the prongs of 40 C.F.R. §

14   1502.9(c)(1)—in implementing its decision to downgrade and remove the red tree vole from

15   Survey and Manage. *Id.* at 562; *see also* 2007 BLM ROD, AR 17306, at 7; 2007 FS ROD, AR

16   17307, at 7. The Agencies, in their briefs, classify this decision as striking down the annual

17   species review ("ASR") process in part, as they maintained in *Boody* that NEPA did not apply

18   to that series of decisions. (Defs.' Mot. 9 (Dkt. No. 45 at 18).) Thus, they "chose to consider

19   the potential implications of that decision on all species affected by the [Annual Species

20   Review] process." 2007 BLM ROD, AR 17306, at 7; 2007 FS ROD, AR 17307, at 7.

21           Finally, in 2007, the Agencies issued the Final Supplement ("FSEIS" or "2007 Final

22   Supplement") to the 2004 SEIS. (*Id.*) These documents are the subject of this litigation. With

23   these documents, once again, the Agencies opted to remove Survey and Manage from the

24   Northwest Forest Plan. *See* 2007 BLM ROD, AR 17306, and 2007 FS ROD, AR 17307.

25   _____

26           [6] Defendant-Intervenor here, D.R. Lumber, was also an intervenor in *Boody*.

ORDER
PAGE - 8

The Agencies stated that the 2007 Final Supplement was intended to reduce the Agencies' cost, time, and effort in conserving rare and little-known species, to continue to provide for the diversity of communities, and to achieve timber output goals. 2007 FSEIS at 5–6, AR 16299. The Agencies also contend that the Final Supplement addresses the three most recent major court decisions: *Douglas Timber Operators*, *NEA v. Rey*, and *Boody*. 2007 BLM ROD, AR 17306, at 7; 2007 FS ROD, AR 17307, at 7. According to the Agencies, the 2007 Final Supplement "contains all of the analysis in the 2004 FSEIS, . . . and [additional documents], updated to respond to new information, inflation, and additional public review . . . . The Final Supplement . . . contains additional background material about habitat, management activity levels, species outcomes, and previous analyses, when compared with the 2004 SEIS. . . ." *Id.* In summary, the Agencies concluded, after this additional process, that Survey and Manage "has unexpectedly limited the Agency's ability to accomplish the goals and objectives of the Northwest Forest Plan," and that the best remedy would be to cease to implement it entirely. *Id.*

A coalition of environmental groups challenged the action. Plaintiffs allege that the 2007 Final Supplement and Records of Decision violated NEPA, 42 U.S.C. §§ 4321–4370d, and its implementing regulations, in recommending removal of Survey and Manage. Plaintiffs also allege that the Agencies violated the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600–1676, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1705, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, in issuing RODs to adopt the preferred alternative from the 2007 Final Supplement. (Compl. 1 (Dkt. No. 1 at 2).) The Court granted intervention as a right to commercial lumber company D.R. Johnson. (*See* Dkt. No. 17.) Plaintiffs have now moved for partial summary judgment only on their NEPA claims. (*See* Dkt. No. 34.) Both the Agencies and D.R. Johnson have opposed summary judgment, and have moved for summary judgment themselves.

//

ORDER
PAGE - 9

## II.     STANDARD OF REVIEW

The National Environmental Policy Act ("NEPA") is "our basic national charter for protection of the environment." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1215–16 (9th Cir. 1998) (citing 40 C.F.R. § 1500.1(a)). NEPA has "twin aims. First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns" in the decision-making process. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983) (citation and internal quotation marks omitted). NEPA does not contain substantive environmental standards. Rather, it "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Metcalf v. Daley,* 214 F.3d 1135, 1141 (9th Cir.2000); *see also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348 (1989); *Kern v. BLM*, 284 F.3d 1062, 1066–67 (9th Cir. 2002).

Plaintiffs' NEPA challenge to the 2007 Final Supplement and RODs proceeds under the Administrative Procedure Act, under which the Court may hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The Court thus considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).

When, as here, the agency prepared an EIS, the Court reviews the EIS for adequacy. In doing so, the Court applies a "rule of reason to determine whether the EIS contains a reasonably thorough discussion of the significant aspects of probable environmental consequences." *Or. Natural Res. Council v. Lowe,* 109 F.3d 521, 526 (9th Cir. 1997) (internal quotation marks omitted). Under this standard, review consists of ensuring that the agency took a "hard look" at the relevant factors, and thoroughly evaluated the potential environmental consequences of a proposed action. *Neighbors of Cuddy Mountain v. U.S. Forest Svc.,* 137

F.3d 1372, 1376 (9th Cir. 1998). This "reasonableness" review does not materially differ from an "arbitrary and capricious" review. *Or. Natural Res. Council v. Marsh,* 490 U.S. 360, 377 n. 23 (1989) (noting that "difference between the 'arbitrary and capricious' standard and the 'reasonableness' standard is not of great pragmatic consequence"). However, this review is ultimately procedural. "This inquiry must 'be searching and careful,' but "the ultimate standard of review is a narrow one . . . When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinion of its own qualified experts, even if as an original matter, a court might find contrary views more persuasive." *Id.* at 378 (internal citations omitted). "NEPA does not mandate particular results . . . ." *Westlands Water Dist. v. Dep't of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004).

Summary judgment is appropriate in this case because the parties agree that the administrative record presents no genuine issue of material fact. *Cf. Sierra Forest Legacy v. U.S. Forest Svc.*, No. C-08-4240-SC, 2009 WL 2767722, at *4 (N.D. Cal. Aug. 27, 2009) (finding that when the "Court's review is confined to the administrative record, [the] case presents no questions of material fact that would render it inappropriate for resolution by summary judgment"); (Pls.' Reply 1 (Dkt. No. 49 at 6); *see also* Defs.' Mot. 1–11 (Dkt. No. 45 at 10–20); Defs.' Mot. 1 (Dkt. No. 46 at 4).)

## III.     DISCUSSION

### A.     Motion to Strike Declaration of Dr. Odion

As a general rule, judicial review of agency actions is limited to the administrative record. *Lands Council v. Powell,* 395 F.3d 1019, 1029 (9th Cir. 2005) (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–33 (1985)). This "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson*, 885 F.2d at 555 (emphasis in original) (internal citations and quotation marks omitted). "The whole record is not necessarily those documents that the agency has compiled and submitted as the administrative record; the court must look to

all the evidence that was before the decision-making body." *Pub. Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982) (internal citations and quotations marks omitted). Even if not presented to the agency, "a district court may extend its review beyond the administrative record and permit the introduction of new evidence in NEPA cases where the plaintiff alleges 'that an [EIS] has failed to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug.'" *Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1447–48 (9th Cir. 1993) (citing cases). Additionally, supplemental information that explains or clarifies technical matters involved in the agency action is allowed. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

Dr. Odion's declaration fits into these exceptions. Dr. Odion's previous declaration in *Rey* is nearly identical to the one presented to the Court in this case, and therefore was at least "indirectly" before Defendants for consideration when they created the 2007 SEIS and RODs. *See* Odion Decl., AR 96–119; *Thompson*, 885 F.2d at 555.[7] To the extent that the declarations differ, Dr. Odion here explains the FRCC, which was a methodology used by the Agencies in compiling the 2007 Final Supplement and discussed in more depth below. At the very least, the extra information helps to explain technical terms and data or other complex subject matters. *See Northwest Ecosystem Alliance, et al. v. Rey, et al.*, 380 F. Supp. 2d 1175, 1184 (W.D. Wash. 2005) (citing *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005)). It also identifies serious controversies with the methodology's use for land management decisions—a "stubborn problem" if there ever was one. *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450.

The Court declines to strike the declaration of Dr. Odion.

---

[7] Both of Dr. Odion's declarations address the alleged deficiencies in Defendants' analysis in choosing a methodology for fire frequencies and classifications. In both cases Dr. Odion is critical of Defendants' conclusions based on what he considers to be misinterpretations. As such, his resulting opinions are materially similar.

**B.     Preclusion**

Defendant-Intervenor D.R. Johnson[8] has argued that Plaintiffs' claims are barred by issue and claim preclusion. (Def.'s Resp. 10 (Dkt. No. 46 at 13).)

Two of the Plaintiffs in this matter were also parties in *Boody*. 468 F.3d 549 (9th Cir. 2006). Following remand from the Ninth Circuit, the Oregon district court enjoined BLM from implementing two timber sales "until such time that either sale conforms to the 2001 Survey & Manage ROD or, in the alternative, a resource management plan that satisfies the FLPMA and NEPA deficiencies found by the Ninth Circuit in this case." *Klamath-Siskiyou Wildlands Center v. Symons*, No. 03-3124-CO, 2007 WL 539434, at *1 (D. Or. Feb. 12, 2007). After the Agencies issued the 2007 Final Supplement and accompanying RODs—the same documents challenged here—the Oregon district court lifted the injunction on the two timber sales, finding simply that "Agency actions within the scope of the agency's authority are entitled to a presumption of regularity," and that, therefore, the Agencies had complied with the conditions for repealing the injunction. (*See* Order (Dkt. No. 46 at 4).)

Claim preclusion "bars any subsequent suit on claims that were raised or could have been raised in a prior action" and applies "when there is (1) an identity of claims; (2) a final judgment on the merits; and (3) identity or privity between the parties." *Cell Therapeutics, Inc. v. Lash Group, Inc.*, --- F.3d ---, 2009 WL 3837544, at *8 (9th Cir. Nov. 18, 2009). The test is conjunctive; if any element is not met, then preclusion does not apply. *Headwaters, Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052 (9th Cir. 2005) (finding all three elements "necessary to establish claim preclusion").

First, there is no privity here. Although there is some overlap, nine of the eleven Plaintiffs are entirely new to this case; only two were also parties in *Boody*. Courts are "not able to find privity merely on the basis that all of the plaintiffs are environmental groups." *Or.*

---

[8] The federal Defendants did not join in this argument.

*Natural Desert Ass'n v. Green*, 953 F.Supp. 1133, 1149 (D.Or. 1997). There is no rule that would require the two overlapping environmental groups to refrain from joining in this suit, simply to prevent a sweeping holding of preclusion.

More importantly, the claims are not the same. "The doctrine bars the re-litigation of issues actually litigated in a prior suit, as well as issues that could have been litigated in that prior action." *Latman v. Burdette*, 366 F.3d 774, 783 (9th Cir. 2004). The claims brought in this case are not identical to those raised in *Boody*, nor could they reasonably have been raised there. While the SEIS and RODs may have *resulted* from the previous litigation, it would have been impossible for Plaintiffs to challenge these documents in the prior action—they were issued long after the Complaint in that case was filed. Plaintiffs hardly had a "chance" to test the validity of a document that was not then in existence.

For much the same reason, Plaintiffs did not have a full and fair opportunity to litigate this claim on the merits. The Order at issue lifts an injunction *after* final judgment had been entered. It is dubious that this kind of Order could have preclusive effect. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27, comment h ("If a judgment does not depend on a given determination, relitigation of that determination is not precluded."); *Bobby v. Bies*, 129 S.Ct. 2145 (2009) (finding that a determination is only "necessary or essential" to a judgment, when the "final outcome hinges on it"). The procedural sufficiency of the 2007 RODs and FSEIS was not an item in Plaintiffs' *Boody* complaint. Therefore, Plaintiffs did not have a full and fair opportunity to litigate the claims on the merits.[9]

---

[9] The Court notes that Defendant-Intervenor argued in the *Boody* remand that, because the arguments did not appear in the Complaint, Plaintiffs were *prevented* from challenging the 2007 FSEIS and ROD under NEPA, and must file a new complaint if they wished to do so. (Order (Dkt. No. 46 at 4).) Plaintiffs took Defendants' cues, it seems, and filed the instant lawsuit. To now argue that those claims are precluded would suggest that Defendant-Intervenor believes that the 2007 Final Supplement could *never be challenged*. This is not consistent with the purposes behind NEPA.

**C.     Plaintiffs' Challenges**

Plaintiffs allege that the 2007 Final Supplement violates NEPA in four ways; one of these challenges, in turn, has four discrete subparts. First, they allege that the 2007 Final Supplement lacks a true "No Action" alternative, as required by NEPA. Second, they allege that no new information warrants elimination of Survey and Manage. Third, they allege that the 2007 Final Supplement lacks high-quality information and accurate scientific data in four areas: (1) fire and fuel treatments, (2) costs, (3) species data, and (4) global warming. Fourth, they allege that the 2007 Final Supplement fails to disclose cumulative impacts. The Court addresses each claim in turn.

**a.   The "No Action" Alternative**

The "heart" of an EIS is that document's consideration of alternatives to the proposed action. 40 C.F.R. § 1502.14; *Alaska Wilderness Recreation and Tourism Ass'n v. Morrison,* 67 F.3d 723, 729 (9th Cir.1995). One of these alternatives must be the alternative of "no action." 40 C.F.R. § 1502.14(d). A no-action alternative, generally, "may be thought of in terms of continuing with the present course of action until that action is changed." *Am. Rivers v. FERC*, 201 F.3d 1186, 1201 (9th Cir. 1999) (quoting Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981)). This alternative establishes a baseline against which the proposed action and its alternative may be measured. *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1065–66 (9th Cir. 1998); *see also Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988) (discussing the importance of establishing baseline conditions in order to determine what effect the proposed action would have on the environment).

In this case, the 2007 Final Supplement contains not one, but two no-action alternatives. The two no-action options both react to recent litigation. In "Alternative 1, No-Action with ASRs," the Agencies portrayed the status quo before the Ninth Circuit's decision in *Boody*, but after Judge Pechman's injunction in *NEA v. Rey*; in "Alternative 4, No-Action

without ASRs," the Agencies portrayed the status quo after both cases. However, Plaintiffs argue that neither of these alternatives accurately depicts the status quo in July 2007, when the RODs were issued.

First, and most importantly, although both no-action alternatives account for the injunction entered by Judge Pechman in *NEA v. Rey*, neither alternative reflects the October, 2006, *modification* to the injunction. *NEA v. Rey*, C04-0844-P (Dkt. No. 109), at 2–3. That modification permitted the Agencies to implement the 2004 ROD—which Judge Pechman had invalidated—in four limited circumstances.[10] The Agencies do not dispute that neither alternative accounts for the modification, but they contend that they did not need to account for it because this modification was "limited in scope, was signed late in the analysis process, represents relatively minor changes from the alternatives presented, and is an implementation stipulation of uncertain duration." 2007 FSEIS, AR 16300, at 620. Essentially, they argue that the alteration was so minor that it did not change the benchmark against which amendments are made. (*See also* Defs.' Mot. 18 n.4 (Dkt. No. 45 at 27).) They also argue that to have done otherwise would have meant considering the 2004 RODs, which have been invalidated. (*Id.*)

Plaintiffs' first argument is well taken. Initially, it does not appear that the effect of the injunction's modification was negligible. For example, the modification allows thinning projects in forest stands younger than 80 years old. *NEA v. Rey*, C04-0844-P, Stipulation 3.a

---

[10] That amendment allowed logging and other habitat-disturbing activities on projects to which the 2004 ROD applied if the project fell into one of four categories: (a) Thinning projects in stands younger than 80 years old; (b) Replacing culverts on roads that are in use and part of the road system, and removing culverts if the road is temporary or to be decommissioned; (c) Riparian and stream improvement projects where the riparian work is riparian planting, obtaining material for placing in-stream, and road or trail decommissioning; and where the stream improvement work is the placement large [*sic*] wood, channel and floodplain reconstruction, or removal of channel diversions; and (d) the portions of projects involving hazardous fuel treatments where prescribed fire is applied. Any portion of a hazardous fuel treatment project involving commercial logging will remain subject to the survey and manage requirements except for thinning of stands younger than 80 years old under subparagraph (a). *NEA v. Rey*, C04-0844-P, Stipulation (Dkt. No. 109 at 2–3).

(Dkt. No. 109 at 2). In the past three years alone—since the injunction was modified—the Agencies have authorized, by a conservative estimate, over 130 million board feet in timber sales from such thinning projects—a significant percentage of the predicted probable sale quantity under the Northwest Forest Plan. (*See* Pls.' Reply 5 (Dkt. No. 49 at 10); Defs.' Reply 2 (Dkt. No. 55 at 7).)[11] The statistically significant increase in logging alone demonstrates that the modification affected the natural environment, and must be considered when establishing a baseline for environmental effects of eliminating Survey and Manage. Similarly, it is apparent that the Agencies are implementing the other conditions of the injunction modification. (*See* Decision R. for Hazardous Fuel Reduction Treatments (Dkt. No. 49, Ex. A).) The stipulation's effect was neither "limited" nor "minor" enough to warrant ignoring it entirely.[12]

---

[11] Defendants did not refute the data presented in Plaintiffs' declarations, or move to strike them. The data show that in 2008, the Roseburg District of the BLM advertised for sale a total of 15 logging projects totaling 41.5 million board feet. (Eatherington Decl. ¶ 3 (Dkt. No. 50 at 2).) Also in 2008, the Siuslaw National Forest advertised for sale eight thinning projects totaling 39.3 million board feet. (LeGue Decl. ¶ 4 (Dkt. No. 51 at 2–3).) In 2008, the Eugene District of the BLM advertised for sale 11 timber sales totaling 49.5 million board feet. (*Id.*) And in the same year, the Klamath National Forest authorized nine thinning projects of undetermined board feet output. (Baker Decl. ¶¶ 2–3 (Dkt. No. 54 at 1).) Finally, the Secretary of the Interior Ken Salazar very recently announced that the BLM would consider offering for logging 62 sales, which, according to the BLM Director's own estimation, would "provide over 200 million board feet for local mills . . ." (Dep't of the Interior Media Advisory (Dkt. No. 52).) "For comparison purposes, from 2005 to 2008, the BLM has offered an average of 206 million board feet per year, of which approximately 150 [million board feet] was harvested." (*Id.*) Most of this timber harvest is slated to come from stands younger than 80 years old—and thus is directly authorized by the injunction modification.

[12] The Court is skeptical that an agency may ignore even limited or minor changes to the status quo when calculating a no-action alternative. The no-action alternative must accurately reflect the state of the world at the time of the EIS. Allowing an agency to ignore a change by deciding that it is of little consequence is a slippery slope to eroding the meaningfulness of a baseline. The Agencies provided no legal citations for this proposition, and the Court can find none. Because the Court need not hold so broadly to decide this case, the Court declines to reach this issue at this time.

ORDER
PAGE - 17

The Agencies' argument that accounting for the modification would run counter to *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008), has little merit. In that case, the Ninth Circuit invalidated a no-action alternative that relied on a comprehensive management plan that had previously been found unlawful. *Id.* at 1038. The Agencies here argue that to account for the stipulated amendment—issued by Judge Pechman, it should be noted—they would be basing their no-action alternative on an invalidated document: the 2004 SEIS. But, of course, the court-issued modification was lawful. Accounting for the modification would not incorporate an illegal plan into a no-action alternative; it would simply account for a Court order. The Agencies were required to account for the stipulation in crafting their no-action alternative; failing to do so violated NEPA.

Second, Plaintiffs argue that neither no-action alternative accurately reflects the status quo after *Boody*. *Boody* held that the ASR decision that phased the red tree vole out of Survey and Manage was subject to the procedural rigors of NEPA and the FLPMA. *Boody*, 468 F.3d 549. After *Boody*, the ASR process requires BLM to acquire, evaluate, and apply new information to implement changes or refinements to species' Survey and Manage classifications. *Boody*, 468 F.3d at 553, and go through NEPA's "hard look" analysis, among other necessary procedures. *Id.* at 560. *Boody* was decided in 2006; thus, the 2007 Final Supplement is the first agency action in this story line to consider it. The Agencies crafted Alternative 4 in direct response to *Boody*. 2004 FSEIS at xxiv, 70–71, AR 16299.

By crafting Alternative 4 as a baseline in which *no* species had been removed from Survey and Manage—effectively, interpreting *Boody* as invalidating every removal decision that they had made prior to that case—it can be said the Agencies implied that they had reinstated all species previously removed through ASR decisions. Plaintiffs argue that there is nothing in the record to indicate that the Agencies had done so. Moreover, they argue, *Boody* technically applied only to the red tree vole; thus, that Alternative 4 is an imagined status quo that is not supported by the record.

This particular argument is not persuasive. The Agencies' reading of *Boody* is faithful to the text of that case. Although technically limited to a single species, *see Boody*, 468 F.3d at 555, the case effectively changed the Agencies' understanding of the ASR process; it is reasonable to assume that all previous ASR decisions were retroactively invalidated. More importantly, their decision to create a no-action alternative that accounts for a state of the world that is prospectively mandated by a court decision is responsible. This is a conservative baseline—if anything, it would make prospective changes by removing Survey and Manage *more* stark, because it requires the agencies to account for more species. *See* 2007 FSEIS at 128, AR 16299 ("No-Action Alternative 4 . . . has 58 more species . . . included in Survey and Manage than No-Action Alternative 1."). Therefore, the inclusion of Alternative 4 did not violate NEPA.

Plaintiffs also argue, in their opposition brief, that the notion of having *two* no-action alternatives makes no cognitive sense. (Pls.' Reply 3 (Dkt. No. 49 at 8).) This is a novel argument, but it has merit; rationally, there can be only one baseline. For all of the reasons described above, the agencies were obligated to provide a single, comprehensive no-action alternative that accurately represented the status quo at the time of the 2007 Final Supplement. This alternative must (1) account for *Boody*, by assuming that the Ninth Circuit's case invalidated all previous ASR decisions, and (2) account for the injunction modification entered in *NEA v. Rey*. Failing to do so failed to depict accurately the Agencies' "present course of action," *Am. Rivers*, 201 F.3d at 1201, and thus violated NEPA.

### b. New Information Warranting Elimination of Survey and Manage

In *NEA v. Rey*, the Court found, as is uncontrovertibly true, that Survey and Manage is "only part of the overall strategy of the [Northwest Forest] Plan" to ensure rare species' survival. *NEA*, 380 F. Supp. 2d at 1191. The Plan contemplates a system of conserved forests—the Reserves—and this, untouched habitat is the primary method for conservation:

> "However, while the standard was not the primary management tool for these species, the 2000 SEIS acknowledged that the standard was created to address concerns that certain species might be so rare or isolated that the Reserve system would not provide reasonable assurance of their persistence. . . . [T]his concern was due to a lack of scientific information, small and endemic populations associated with scarce habitats, and impacts from previous management."

*Id.* at 1191–92. In other words, the Reserves are not enough to ensure that certain rare or little-known species survive; Survey and Manage fills the gap. *Id.* at 1192. Survey and Manage, therefore, while only a part of the overall strategy to protect these species, "was a necessary part to satisfy the Plan's foundational objectives."[13] *Id.* (internal quotation marks omitted).

The 2000 SEIS does contemplate a world in which "new information" would warrant a "more fundamental shift"—i.e., eliminating Survey and Manage. *See id.* Judge Pechman investigated whether the Agencies had such new information, and had disclosed it to the public in the 2004 SEIS that recommended eliminating the standard, as NEPA would require. *Id.* Based on the information presented at that time, Judge Pechman concluded that "none of this information addresses whether conditions have changed such that the Survey and Manage standard is no longer a necessary part of the management of these species." *Id.* The same question concerns the Court again today. As before, in order to justify eliminating Survey and Manage in compliance with NEPA, the Agencies must "disclose and explain on what basis they deemed the standard necessary before but assume it is not now." *Id.*

Plaintiffs assert that the Agencies have not done so. The Agencies counter that they came up with *five* categories of new information demonstrating "that forest conditions are fundamentally different than those that existed or were contemplated at the time of the

_____

[13] Those objectives, as discussed above, are a balance between productivity and conservation: "to protect long-term health of our forests, our wildlife, and our waterways . . and produce a predictable and sustainable level of timber sales and non timber resources that will not degrade or destroy the environment." 2007 FSEIS at 101, AR 16299. The Agencies maintain that Survey and Manage is impeding these objectives. (Defs.' Mot. 15 (Dkt. No. 45 at 24).)

[Northwest Forest Plan]." (Defs.' Mot. 15 (Dkt. No. 45 at 24).) In addition to (1) the contention that there is simply more late-successional or old-growth forest than anticipated, they argue that (2) there are many more known sites of Survey and Manage species than originally anticipated; (3) that there is less timber being harvested than expected; (4) that the rates of in-growth of late-successional and old-growth forests has been higher than anticipated; and (5) that there have been more significant increases in diversity and connectivity of late-successional forests than expected. (*Id.* 15–16 (Dkt. No. 45 at 25).)

All of this is to say that Survey and Manage is working. The first, fourth, and fifth categories of "new information," especially, do not undercut the assumptions underlying Survey and Manage. Rather, they indicate that the whole Plan, *including* Survey and Manage, is accomplishing its goal of "protect[ing] long-term health of our forests," which is dependent upon vibrant biodiversity. *See* 2007 FSEIS at 101, AR 16299; *id*. at 134 ("The Northwest Forest Plan anticipated and planned for increases in late-successional acres in the long term . . .").[14] As for the third category of new information, the fact that there is less timber being harvested was actually an assumption that was part of the balancing act of the Northwest Forest Plan. It would be impossible to achieve conservation goals without *some* decrease in logging, just as it would be impossible to achieve output goals without some negative consequences for conservation. The fact that there is less harvest than predicted is not a reason to throw out an entire category of conservation guidelines and standards. In sum, these three categories of "new information" do not fulfill the Agencies' obligation to disclose "what basis they deemed the standard necessary before but assume it is not now." *NEA*, 380 F. Supp. 2d at 1192.

---

[14] Additionally, since 1994, fifteen years have passed—changing some forests' official categorization from young to late-successional. 2007 FSEIS at 136, AR 16299. This does not modify any assumption on which Survey and Manage was predicated; presumably, FEMAT understood that forests would naturally age.

The only category of "new information" that truly undermines the assumptions underlying Survey and Manage is the data indicating that the species protected by the program are more viable than originally thought. 2007 FSEIS at 128; AR 16299 (the 1994 Standards and Guidelines contemplated that "[a]s experience is acquired with these requirements, agencies may propose changes . . . [that] could include . . . dropping this mitigation requirement for any species whose status is determined to be more secure than originally projected."). Survey and Manage was largely designed as a cautionary measure to ensure that rare species, and species about which little was known, were not carelessly exterminated. Now, after fifteen years of data collection, "the Agencies . . . have a better understanding of the distributions, abundances, and habitat associations of species associated with mature and old-growth forests." *Id.* at 162. And "many species [are] more numerous than previously known." *Id.* at 163. This kind of information could indicate that Survey and Manage is no longer necessary.

However, the Agencies concede that the elimination of Survey and Manage will have negative effects for a large number of species—and totally unknown effects for others. Of the approximately 400 species originally part of Survey and Manage, the agencies concluded that the elimination of Survey and Manage will likely have negative results for 38 species; and, for 20 more species and 4 arthropod groups, the effect of the elimination of Survey and Manage is still unknown. *Id.* at 130. This is over an eighth of the original species tally.

The Court is mindful of its cabined standard of review, but nonetheless finds that the Agencies' methodology in concluding that Survey and Manage is no longer necessary is flawed enough to be a violation of NEPA. *Cf. Wilderness Soc'y v. Thomas,* 188 F.3d 1130, 1134 (9th Cir. 1999) (holding that the court may entertain allegations "that the Forest Service's general methodology in determining grazing suitability in the Forest Plan was flawed, causing site-specific harm by allowing grazing in an area unsuitable for it"); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1068 (9th Cir. 2002). The Agencies cannot abandon

fifty or more species whose viability may still be dependent on the continued implementation

of Survey and Manage. *NEA*, 380 F. Supp. 2d at 1192. In other words, wholesale elimination

of the standard is not appropriate where an eighth of its original beneficiaries are still in need

of its protection. There is not enough new information disclosed that would ensure the public

that elimination of Survey and Manage is warranted. This "clear error of judgment" requires

holding the agency action invalid under NEPA. *Idaho Sporting Congress*, 137 F.3d at 1149.

### c. Information On Which the 2007 Final Supplement is Based

An EIS must contain "high quality" information and "accurate scientific analysis." 40

C.F.R. § 1500.1(b); *Ctr. for Biological Diversity v. U.S. Forest Svc.*, 349 F.3d 1157, 1167 (9th

Cir. 2003). This requires the Agencies to ensure "the professional integrity, including scientific

integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. §

1502.24. To take the required "hard look" at a proposed project's effects, an agency may not

rely on incorrect assumptions or data in an EIS. *Id.* at § 1500.1(b) ("Accurate scientific

analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.");

*Native Ecosystems Council v. U.S. Forest Svc.*, 418 F.3d 953, 964–65 (9th Cir. 2005).

However, the Court need not decide whether the 2007 Final Supplement is based on the "best

scientific methodology available, nor does NEPA require [a court] to resolve disagreements

among various scientists as to methodology." *Greenpeace Action v. Franklin*, 14 F.3d 1324,

1333 (9th Cir. 1992). A mere difference in opinion or disagreement with a conclusion is

insufficient, under NEPA, to overturn agency action. *Id.* Plaintiffs allege that the 2007 Final

Supplement does not contain the appropriate level of accurate scientific data and analysis in

four particular areas: (1) its assessment of fire and fuel treatments, (2) its assessment of the

costs of Survey and Manage, (2) its data about Survey and Manage species, and (4) its analysis

of global warming. (Pls.' Mot. 19 (Dkt. No. 34 at 24).)

//

//

### i. Fire and Fuel Treatments

The Agencies frequently declare that Survey and Manage interferes with their ability to restore forest health, including "fuel treatments" that reduce the threat of catastrophic wildfire. *NEA*, 380 F. Supp. 2d at 1194; 2007 FSEIS at 157–58, AR 16299. By way of background, the forests encompassed by the Northwest Forest Plan are subject to disturbance by fire. The Agencies control wildfire through "fuel treatments," to protect both the ecology and the human life and property in and around these forests. *Id.* "Fuel treatments" can include proscribed burning and/or selective logging. *NEA*, 380 F. Supp. 2d at 1194. In *NEA*, Judge Pechman found that the Agencies had improperly relied on outdated data to determine how much of the Plan's forest land should burn annually. *Id.* at 1195–96.

The Agencies have abandoned this acreage data, and instead have used the Fire Regimes Condition Class ("FRCC") methodology to "help identify the scale of the fuel hazard reduction need." 2007 FSEIS at 581, AR 16300. The methodology provides an "approximation of the magnitude of the effort needed" to conduct adequate fire management programs. *Id.* FRCC "classifi[es] ecosystems into categories that reflect the degree to which a vegetative community is at risk of undesired effects from wildfire." 2007 FSEIS at 151, AR 16299. In the 2007 Final Supplement, the Agencies first estimated that "over 21 million acres of federal and private land" is in urgent need of fire treatment, that they actually carry out 80,000 acres of fuel reduction treatments each year, and that Survey and Manage prevents the Agencies from treating approximately 5,360 acres annually. *Id.* at 153, 157.

Plaintiffs lodge four arguments against this data. The Court finds two of these arguments to be correct, and so declines to fully address the other two.[15]

---

[15] Plaintiffs also take issue with the Agencies' statement that Survey and Manage is hindering fuel treatments in the human communities in the vicinity of Federal lands that are at high risk from fire—the wildland urban interface, or WUI. *See* Notice, 66 Fed. Reg. 43384 (Aug. 17, 2001); (*see also* Def.'s Mot. 22 n.8 (Dkt. No. 45 at 31).) Although the Court need not reach this argument, the Court does note that almost *five years* have passed since the Agencies

Plaintiffs allege that the 2007 Final Supplement overestimates the number of acres in need of fire treatment; in doing so, they question the use of FRCC methodology to quantify the land within the Northwest Forest Plan in need of fuel hazard reduction. However, the Agencies insist that FRCC does not measure fire hazard; rather, it measures increasing departure from natural conditions due to altered fire regimes or other hazards. 2007 FSEIS at 152, AR 16229. The Agencies' main disagreement with Plaintiffs' characterization is that they did not "rely" on FRCC to measure fire risk; instead, the Agencies state that fire risk is a measure of localized factors that are "beyond the scope of the 2007 Supplement," and that FRCC just "underscores the importance, urgency, and enormity of the current fuel hazard reduction issue." (Defs.' Reply 8 (Dkt. No. 55 at 13).) But this begs the question: If FRCC does not measure fire hazard, what does? Why did the Agencies cite it *alone* as a basis for their fuel treatments program? How could it "provide an accurate landscape-scale estimate" of disturbances associated with increased fire risk? (Defs.' Mot. 20 (Dkt. No. 45 at 29).) These questions are the core of NEPA; they are unquestionably *not* beyond the scope of the 2007 Final Supplement. The agencies must identify reliable science behind a significant justification for eliminating Survey and Manage. 40 C.F.R. § 1502.24. If FRCC was not the methodology they used, they were obligated by NEPA to disclose the methodology that they did.

Moreover, FRCC's own authors express concern about basing land management decisions on FRCC. (Odion Decl. ¶ 8 (Dkt. No. 35 at 5).) Allowing the agencies to "ignore reputable scientific criticisms" with regard to the use of FRCC to inform land management

---

adopted "management recommendations" for species near the WUI, and that it appears to be high time to account for those amendments in order to comply with NEPA. *See NEA*, 380 F. Supp. 2d at 1195 (rejecting this argument because too little time—only one year—had passed). Additionally, the WUI calculations themselves also seem to be highly overgeneralized. (*See* Odion Decl. ¶ 9 (Dkt. No. 35 at 5–6).)

Plaintiffs also allege that the 2007 Final Supplement improperly lumps together types of forests that do not share a similar risk pattern for fire. (Pl.'s Mot. 23 (Dkt. No. 34 at 28).) This argument is partially encompassed by the Court's holding regarding the FRCC.

decisions hardly furthers NEPA's aims. *Seattle Audobon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) (failing to address scientific uncertainties violated NEPA). The Agencies were obligated, at the very least, to conduct a full discussion of the doubtful scientific reliability of using FRCC in fire-related land-management decisions.[16] Failure to do so violated NEPA.

Finally, Plaintiffs point out that the Agencies have not adequately explored other solutions to the 5,360-acre deficit. In *NEA*, Judge Pechman found that the Agencies "failed to take a hard look at whether the 8,500 acre gain[17] by eliminating the Survey and Manage standard would still be necessary if [budget, personnel, and other problems] were resolved. As such, the Agencies failed to provide sufficient information to the public . . ." *NEA*, 380 F. Supp. 2d at 1196. The 2007 Final Supplement does not cure this deficiency. The Agencies this time pointed to "weather, permitted smoke emissions (air quality), operational windows, social and other issues" as factors that have constrained the fuel treatment program. Occasionally, the Agencies point to "other government funding priorities" as a reason for the deficit. 2007 FSEIS at 305, AR 16229. The Agencies allege that they did not need to explore these factors—and, thus, whether the meager 5,360-acre gain could be achieved through less drastic means— because they are "external factors largely beyond the Agencies' control." (Defs.' Mot. 21 n.7 (Dkt. No. 45 at 30).) But they provide no legal citation for this distinction, because there is none: the Agencies are obligated to consider "the *relevant* factors" that bear on their decision, regardless of whether they are within the Agencies' control. *Idaho Sporting Congress*, 137 F.3d at 1149 (emphasis added). The Agencies' investigation of alternatives to wholesale eliminating Survey and Manage to ameliorate a fractional number of acres affected by the

---

[16] The Agencies also argue that they relied primarily on their actual treatment of 80,000 acres annually. But their discussion of the need for fire treatment cannot have been so immaterial, why else engage in it at all?

[17] As above, the Agencies originally found that eliminating Survey and Manage would increase their capacity to conduct fuel treatments on 8,500 acres of land within the Northwest Forest Plan. In the current 2007 Final Supplement, they reduced this estimation to 5,360 acres.

program is neither consistent nor thorough. Again, failure to take a hard look at alternative ways to close a small acreage gap failed to provide sufficient information to the public about the basis for the Agencies' decision, and thus violated NEPA.

### ii. Costs

The Agencies eliminated Survey and Manage in part to reduce "excessive" costs. 2007 FSEIS at xii; AR 16229; 2007 ROD at 25, AR 17307. According to the Agencies, Survey and Manage costs $21 million annually to implement. 2007 FSEIS at 305, AR 16229.

Like in *NEA*, the costs challenge is persuasive in part. The fuel treatment costs are invalid under NEPA because the fuel treatment methodology is fundamentally flawed and incomplete. *See NEA*, 380 F. Supp. 2d at 1196–97. Additionally, the Agencies have disclosed no data underlying their estimation for $6.4 million for fuel treatment costs, and have not responded to Plaintiffs' argument in this regard. The fuel treatment cost estimate is invalid.

However, Plaintiffs' other arguments are not persuasive. They argue that the 2007 Final Supplement bases its estimation of the costs associated with "strategic surveys," of which a random multi-species survey is a type. (Pls.' Mot. 25 (Dkt. No. 34 at 30).) They argue that the Agencies have stated that these surveys are completed, and therefore they should not be factored into future years' costs. (*Id.*) But the Agencies specifically noted that costs may decline over time. 2007 FSEIS 305, AR 16229. Furthermore, because Survey and Manage is an ongoing program, it is conceivable that subsequent surveys would impose similar, if intermittent, future costs. Additionally, the Agencies adequately disclosed their methodology for calculating the acreage upon which their other survey costs are based. *See* 2007 FSEIS 158–60, AR 16229. This satisfied NEPA.

### iii. Species Data

Plaintiffs also challenge the sufficiency of the data that underlie the Agencies' predictions about how the removal of Survey and Manage will affect species. They identify multiple instances where the Agencies admitted inaccuracies or incomplete data as they

1   prepared the 2007 Final Supplement, and allege that these discrepancies violate the Agencies'

2   obligation to support the 2007 Final Supplement with high-quality information and accurate

3   scientific analysis. 40 C.F.R. § 1500.1(b).

4        Here, Plaintiffs' numerous citations to the administrative record, in which the Agencies

5   acknowledged incomplete or incorrect data, tend to pull quotes out of context. For example,

6   Plaintiffs point to AR 8429 as establishing that great grey owl data were "questionable," but a

7   closer read of the document in question reveals that the analyst was confident that the

8   discrepancies were not pertinent for purposes of final analysis or conclusion. More

9   importantly, the acknowledged discrepancies fulfill the Agencies' requirement to disclose

10  areas in which their information is incomplete or unavailable. 40 C.F.R. § 1502.22. The

11  acknowledgements of some discrepancies or holes in the data provided evidences a

12  conservative approach that should be commended under NEPA, not criticized.

13       However, as Plaintiffs contend, there are woefully incomplete data in the 2007 Final

14  Supplement for fifty species. The Agencies concede that they did not conduct "extensive and

15  general regional surveys" for fifty of the original 404 species covered by Survey and Manage.

16  2007 FSEIS at 162, AR 16229. The Agencies reply that they did not need to conduct one

17  specific type of survey—an RMS survey—for three of these species, because other data

18  allowed for reliable extrapolation about abundance. (Defs.' Mot. 26 (Dkt. No. 45 at 35).) They

19  allege that they relied on "well-founded statistical analysis techniques" to make these

20  assumptions about distribution. But they did not account for the other forty-seven, and

21  abandoning fifty species to dubious assumptions about their viability abrogates the Agencies'

22  mandate under Survey and Manage, and does not provide the kind of "accurate information"

23  necessary to satisfy NEPA. The Court is especially concerned about the Agencies' propensity

24  to use *pre-disturbance survey data*—in other words, old data that does not account for the very

25  types of activities that most threaten species welfare—to conduct annual species reviews. *See*

26  Elec. Commc'n, AR 8806–07 (discussing edits for inclusion in the 2007 FSEIS: "I

1  substantially softened the 'pre-disturbance survey data absolutely cannot be used to make

2  inferences' stance, since we've been doing just that in ASRs since the beginning."); Elec.

3  Commc'n, AR 8808 ("Most known site records have come from nonrandom surveys . . .

4  Statistically the results can be said to have no inference outside the areas surveyed . . . This is

5  key to effects determinations in [the 2007] SEIS since over two-thirds of the Survey and

6  Manage species sites in agency databases are from pre-disturbance surveys.") If two-thirds of

7  the sites are unreliable, the Court must find that the agencies abrogated their duties under

8  NEPA and its regulations to ensure "the professional integrity, including scientific integrity, of

9  the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24; *see*

10 *also* 40 C.F.R. § 1500.1(b). For the same reasons discussed above, the Agencies must conduct

11 full, accurate species reviews on all of the species covered by Survey and Manage in order to

12 provide the information that would suggest that the standard is no longer necessary.

### iv.  Global Warming

14     Plaintiffs argue that the Agencies did not take the requisite "hard look" at the impact of

15 increased logging in the Plan area on climate change—and vice versa. However, Plaintiffs

16 have not carried their burden on this particular issue to show that the agencies' choice was

17 arbitrary or capricious. This holding does not have to do with the accuracy of the data, or with

18 the undoubtedly pressing need to account for climate change—it flows from Article III courts'

19 standard of review of agency actions, and the Agencies' obligations under NEPA.

20     As Plaintiffs concede, the Agencies need not respond to every single scientific study or

21 comment. *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 667 (9th Cir. 2009). Even if the study

22 "directly challenges" the scientific basis upon which the 2007 Final Supplement rested, the

23 Agencies only need to disclose and respond to this information in the EIS itself. *Ctr. for*

24 *Biological Diversity*, 349 F.3d at 1167; 40 C.F.R. § 1502.9(b).

25     The global climate change comments and studies cited by Plaintiffs undoubtedly

26 present an additional set of information at which the agencies were bound to take a "hard

1　look." Although the Agencies' conclusions may be conclusory and even incorrect, the

2　Agencies were only obligated, at the maximum, to disclose the opposing viewpoints and

3　explain their decision. This, they clearly did. *See* 2007 FSEIS at 642 (responding to

4　arguments), AR 16229; *id.* at 145–46 (chapter entitled "Global Climate" determined, *inter alia*,

5　that "management activities under the Northwest Forest Plan would cause a change in global

6　atmospheric carbon dioxide of less than 0.01 percent of the total" and investigating climate

7　change's impact on species). Although Plaintiffs (and even the Court) may be inclined to

8　disagree with the Agencies, difference in opinion or disagreement with a conclusion is

9　insufficient to overturn agency action. *Greenpeace Action*, 14 F.3d at 1333. There was no

10　NEPA violation in the Agencies' consideration of global warming.

### d.　Disclosure of Cumulative Impacts

12　　　While the Agencies were considering the 2007 Final Supplement, the Department of

13　the Interior and BLM were also considering the Western Oregon Plan Revisions ("WOPR"),

14　which would have amended the resource management plans of six BLM districts across

15　Oregon. The Department of the Interior approved the RODs for the WOPR on December 30,

16　2008, more than a year and a half after the 2007 Final Supplement and RODs were issued. The

17　WOPR was promptly challenged by a number of parties in multiple courts. On July 16, 2009,

18　the Secretary of the Department of the Interior withdrew the WOPR RODs, effective

19　immediately, finding significant legal error. (Farquhar Mem. (Dkt. No. 45-2).)

20　　　The Agencies here declined to consider the WOPR alternatives during the 2007 Final

21　Supplement process because, at the time of the 2007 Final Supplement, a decision was not

22　expected for over a year. The Agencies did not consider such changes to be "foreseeable," and

23　ignored them completely. 2007 FS ROD at 30, AR 17307, 2007 BLM ROD at 33, AR 17306.

24　They also assumed that the impact of WOPR would be minor. 2007 FSEIS at 113, AR 16229.

25　　　One of the assumptions on which the 2007 Final Supplement is based is the assumption

26　that other elements of the Northwest Forest plan remain essentially unchanged. 2007 FSEIS at

554, AR 16300. Plaintiffs challenge the 2007 Final Supplement on the grounds that it failed to consider the cumulative impacts that would likely flow from the combination of (1) eliminating the Survey and Manage standard and (2) the passing of the WOPR. (Pls. Mot. 32 (Dkt. No. 34 at 37).) Defendants respond that this challenge was mooted by the Secretary of the Interior's decision to withdraw the WOPR RODs, and, even if not mooted, their failure to consider the WOPR was not error. (Defs.' Mot. 30 (Dkt. No. 45 at 39).)

The Court first addresses mootness, because it is a jurisdictional issue. *Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 97 n.19 (1983) (mootness of a case or controversy "ousts the jurisdiction of the federal courts and requires dismissal . . .") The case-or-controversy requirement demands that, throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 532 U.S. 1, 7 (1998) (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). It is hornbook law, however, that a challenge is not barred if the action at issue is capable of repetition, yet likely to evade review. *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 514–15 (1911). Agency actions fall within this exception if (1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329 (9th Cir. 1992). In *Greenpeace Action*, the total allowable catch regulation for the 1991 fishing season fell into this exception. First, the regulations only remained in effect for a year, making it difficult to obtain effective judicial review. *See id.* Second, the Agencies relied on the same flawed science each time they enacted a new year-long regulation, making injury likely to recur. *Id.* In *Idaho Department of Fish and Game*, by contrast, an agency action with a life span of four years was "more than enough time for litigants to obtain judicial review." *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Svc.*, 56 F.3d 1071, 1075 (9th Cir. 1995). And the Agencies relied on

1    different science for each recurring document, making it unlikely that the injury would be

2    repeated. *Id.*

3           This case differs from both *Idaho Department of Fish and* Game and *Greenpeace*

4    *Action*, however, because both of those cases dealt with agency actions that naturally expired;

5    in neither case did the agency voluntarily withdraw the action. Generally, a defendant's

6    voluntary cessation of a challenged practice does not deprive a federal court of jurisdiction.

7    *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 189 (2000). However,

8    "[t]he case may nevertheless be moot if the defendant can demonstrate that 'there is no

9    reasonable expectation that the wrong will be repeated.'" *United States v. W.T. Grant Co.,* 345

10   U.S. 629, 633 (1953) (quoting *United States v. Aluminum Co. of Am.,* 148 F.2d 416, 448 (2d

11   Cir.1945)).[18] The Agencies here assert that, because the Department of the Interior withdrew

12   the WOPR based on a determination of legal error in BLM's "no effect" determination under

13   the Endangered Species Act, the Agencies could not reinstate the WOPR as drafted. (*See*

14   Farquhar Memo. (Dkt. No. 45-2); Defs.' Reply 14 (Dkt. No. 55 at 19).) Plaintiffs note that the

15   timber industry has challenged the Department of the Interior's voluntary withdrawal of the

16   WOPR, and that, conceivably, the document could be vacated by a federal court, and the

17   WOPR reinstated. (Complaint, *Douglas Timber Operators v. Salazar*, C09-1704-JR (D.D.C.,

18   *filed* Dec. 8, 2009) (Dkt. No. 49-4).) The plaintiffs in that case argue, *inter alia*, that the

19   Secretary had no authority to withdraw the RODs, and that the action was arbitrary and

20   capricious; they request an injunction reinstating the WOPR RODs. (*Id.* at 7, 10–12.)

21          Although it is a close call, the Court is persuaded that the issue is now either moot, or

22   unripe. First, although the withdrawal of the WOPR RODs was voluntary, it was done on

---

24          [18] As a matter of academic interest, this articulation of the burden of proof is directly
     contradicted by *City of Los Angeles v. Lyons*: "Furthermore, the capable-of-repetition doctrine
25   applies only in exceptional situations, and generally only where the named plaintiff can make a
     reasonable showing that he will again be subjected to the alleged illegality." 461 U.S. 95, 109
26   (1983) (citing *DeFunis* v. *Odegaard,* 416 U. S. 312, 319 (1974)).

ORDER
PAGE - 32

principled legal grounds: the Secretary determined that the WOPR was unlawful under the Endangered Species Act. (Farquhar Mem. (Dkt. No. 45-2).) The Secretary of the Interior's determination of legal error is entitled to significant weight. *See Bronken v. Morton*, 473 F.2d 790 (9th Cir. 1973). Also, although the Court reserves ruling on this issue, it is possible that the Agencies would now be estopped from arguing that the WOPR RODs were lawful. *See Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778, 782 (9th Cir. 2001) ("Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position.") Thus, it is unlikely that the WOPR RODs will be reinstated precisely as written, and thus no reasonable expectation that the harm will be repeated.

Second, although it is conceivable that the withdrawal could be overturned by the District Court in Washington, D.C., that depends on a legal determination that has not yet occurred. This is the type of hypothetical harm that renders a claim unripe. *See Envtl. Defense Ctr. v. U.S. EPA*, 334 F.3d 832 (9th Cir. 2003) ("[T]he 'actual injury' requirement of Article III standing precludes judicial consideration of . . . hypothetical harm.") Although the Court is mindful of the awkwardness that would ensue if the District Court overturned the WOPR RODs—requiring them again to bring a claim under NEPA challenging the 2007 Final Supplement and RODs—the Court believes that an order evaluating Plaintiffs' WOPR cumulative impacts claim at this time would be "an opinion advising what the law would be on a hypothetical state of facts." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).

Third, the Court observes that NEPA cumulative impacts review is a moving target. An agency must only consider the cumulative impacts of its action "when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. 1508.7. Although they may have been required to consider the WOPR at the time of the 2007 Final Supplement, this question now seems stale in comparison to the question of whether *reinstatement* of the WOPR is "reasonably foreseeable."

1   But of course, this question arose *after* the Agencies promulgated the 2007 Final Supplement.

2   NEPA review is backwards-looking, and this question has now been mooted.

3       **D.**    **Abandonment of Other Claims**

4           Defendant argues that Plaintiffs have abandoned their claims under the NFMA,

5   FLPMA, and Endangered Species Act, because they moved only for summary judgment on

6   their NEPA claims. (Defs.' Mot. 34 (Dkt. No. 44 at 43).) Defendants point primarily to the fact

7   that the parties agreed to a revised briefing schedule, in which, *inter alia*, Plaintiffs agreed to

8   file "their motion for summary judgment, not to exceed 40 pages . . ." (Dkt. No. 32 at 2,

9   *modified by* Dkt. No. 42.) The essence of Defendants' argument is that, because the parties

10  agreed to resolve this case on summary judgment on a modified schedule, Plaintiffs should not

11  get a second bite at the apple by filing only for partial summary judgment here.

12          Under ordinary circumstances, an argument that partial summary judgment waives

13  unmoved-upon claims would, of course, fail. A motion for partial summary judgment simply

14  resolves part of a controversy and reserves the balance of the claims for trial. FED. R. CIV. P.

15  56(a) ("A party claiming relief may move . . . for summary judgment on all *or part* of a claim")

16  (emphasis added); *See* CHARLES A. WRIGHT & ARTHUR R. MILLER, 5C FEDERAL PRACTICE

17  AND PROCEDURE § 1381 (3d ed.) ("partial summary judgment will narrow, but not terminate

18  the controversy between the parties"). The cases that Defendants cite are inapposite. The sole

19  question is whether the unique, modified briefing schedule in this case eliminated Plaintiffs'

20  opportunity to move for summary judgment at a later time.

21          The Court finds that it does not. Plaintiffs, in their supporting declarations, alerted the

22  Court to correspondence between counsel that gave Plaintiffs the reasonable understanding that

23  moving for partial summary judgment on their NEPA claims alone would not terminate their

24  ability to seek relief on their other claims. (*See* Frost Decl. Ex. A (Dkt. No. 53-2) (In response

25  to the statement "we will inform you at the earliest date whether we intend to move for partial

26  summary judgment on some claims and proceed to summary judgment on others at a later

ORDER
PAGE - 34

date," Defendants stated "That sounds good.")  There is no reason to circumvent the Rules of Civil Procedure when doing so would thwart one party's reasonable expectations. The NFMA, FLPMA, and Endangered Species Act claims remain live for bench trial or dispositive motion.

### E.    Remedy

Plaintiffs request a permanent injunction. (Pls.' Mot. 37 (Dkt. No. 34 at 42–44).) Cases in the Ninth Circuit "repeatedly have held that, absent 'unusual circumstances, an injunction is the appropriate remedy for a violation of NEPA's procedural requirements." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) (citing cases).[19] To determine whether injunctive relief is appropriate, the Court applies "the traditional balance of harms analysis." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001).

The Agencies have three main arguments against entering the permanent injunction that Plaintiffs request. First, they disagree about whether Plaintiffs can demonstrate irreparable harm, under the Supreme Court's requirement that such harm be at least "probable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987). Second, they contend that remand to the Agencies, not an injunction, is the proper remedy for a NEPA violation. Third, they assert that Plaintiffs' requested injunction is overbroad.

While an injunction is likely to be appropriate under these circumstances, the Court is mindful of its mandate to craft an equitable, and appropriately narrow, remedy. *See Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 822 (9th Cir. 2002). More importantly, as clarified

---

[19] Those "unusual circumstances" generally include irreparable harm to the environment that would flow from *issuing* the injunction. *Thomas*, 753 F.2d at 764 n.8. Unusual circumstances have also been found when an injunction would interfere with a long-term contractual relationship. *Forelaws on Board v. Johnson,* 743 F.2d 677 (9th Cir. 1984).

The Court observes, for purposes of clarity, that this language was called into question by *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987). Although it has never been questioned that environmental cases are often appropriate candidates for injunctive relief, and that a Court must go through the traditional balancing of harms analysis, the Supreme Court eliminated the Ninth Circuit's presumption of harm, and required that the likelihood of injury be at least probable. *Id.*

above, this is only a motion for *partial* summary judgment. Issues of a more substantive nature than the NEPA claims presently before the Court remain live, and resolution of these claims is likely to affect the appropriate remedy. *See Thomas*, 753 F.2d at 763 (discussing various injunctions available under the EndangerSed SpeciSes Act).

Due to the highly complex issues at stake, and the procedural posture of this case, the Court declines to address the issue of a remedy at this time. The parties are directed to confer about appropriate case management in light of this Order, and submit briefing schedules to the Court as necessary.[20]

## IV.    CONCLUSION

For the foregoing reasons, the Parties' Cross-Motions (Dkt. Nos. 34, 45, and 46) are GRANTED IN PART consistent with this Order.

DATED this 17th day of December, 2009.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

_____

[20] This reservation encompasses the issue, raised alone by Defendant-Intervenor, that the statute of limitations bars Plaintiffs' request to reinstate the 2001 ROD. (*See* Intervenor's Mot. 17 (Dkt. No. 46 at 20).) Thus, the Court declines to address this issue at this time.